[No. 3630.]

HENRY JOHNSON v. THE STATE.

1. MURDER — CHARGE OF THE COURT.— The evidence in a murder trial having no tendency whatever to establish an inferior grade than the first degree, the trial court did not err in withholding a charge to the jury upon murder in the second degree.

2. SAME — CIRCUMSTANTIAL EVIDENCE.— See the statement of the case for a charge upon circumstantial evidence *held* sufficient; wherefore the trial court properly refused a special charge upon that subject.

3. SAME — FACT CASE.— See the statement of the case for evidence, which, though circumstantial, is *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Houston. Tried below before the Hon. F. A. Williams.

The appellant was convicted in the first degree for the murder of Mattie Murchison, in Houston county, Texas, on the 28th day of December, 1883, by cutting and stabbing her with a knife, and by striking and beating her with clubs, sticks and other instruments unknown to the grand jury. The death penalty was assessed by the jury. Both the appellant and his victim were negroes.

On page 448 of volume 16 of this series of Reports will be found the case of *Newton Owens* v. *The State*, the appellant in which was convicted in the second degree as a principal in the perpetration of this same murder. This conviction, however, was had principally upon the testimony of entirely different witnesses, and a restatement of the testimony is deemed essential in view of the ruling embodied in the last head-note of this report. It is to be noted, too, that but three witnesses who testified upon the trial of Owens testified upon the trial of this appellant.

S. W. Thompson was the first witness for the State. He testified that he was acquainted with the deceased during her life-time, and lived about one and a half miles distant from the point, in Houston county, Texas, where she was killed. He heard of her death shortly after it occurred. Witness was also well acquainted with the defendant, whom he pointed out in court. The defendant came to the house of the witness on the morning of the day of the murder, under an agreement to assist the witness in the slaughter of some hogs. The slaughter of the hogs was deferred on account of the temperature of the weather. The witness, in the course of a conversation with the defendant on that morning, told defendant that he, witness, had heard that he, defendant, and the deceased had had a quarrel, and that deceased had "given him fits," and had abused him savagely. Defendant replied: "Yes she has, but she will never do it again." Defendant was apparently mad and determined, and, gesticulating with his hands by way of emphasis, repeated two or three times: "She will never do it again." This was early in the morning. The witness again on that day, between 11 and 12 o'clock, saw the defendant at the house of Ike Porter, who lived about a half mile from the witness. At the same time and place, he saw the deceased and Newton Owens. The witness could not remember distinctly the kind of clothes the defendant wore on that day, further than that they were garments in good order, his belief being that they were his Sunday coat, vest, pants and fine shirt. He saw the defendant again about breakfast time on the next day, which was the day after the killing. Defendant then had on good clothes, but witness could not now say that they were the clothes he

wore on the previous day.  At this time the defendant told witness that he expected Mattie Murchison had been killed.  Witness asked him why he thought so, and he repeated to witness some statements that Newton Owens had made.  Defendant volunteered all of the statements witness had deposed to.  Prior to this time witness had heard nothing about the death of Mattie Murchison.  Witness lived north of Ike Porter's house, and Billy Lewis lived about a half mile west.

On cross-examination, the witness testified that he was not present at the coroner's inquest over the body of Mattie Murchison, and heard none of the testimony.  Witness did not see the dead body at any time, but has seen the place where it is said the girl was killed.  Witness disclosed to no one any of the facts he has here testified to, until after the confession and subsequent conviction of Newton Owens.  Witness had been informed that many of the negroes of the neighborhood live in personal fear of the defendant, and he would judge from that fact that they, or some of them, were prejudiced against him.

Re-examined by the State, the witness stated that among the blacks the defendant sustained the reputation of a resolute, determined man, and one likely to execute whatever threat he might make.  Witness did not disclose the facts in his knowledge because of the confession of Newton Owens.

Frank Hill, the next witness for the State, testified that Mattie Murchison was killed in Houston county, Texas, during the latter part of the month of December, 1883.  He was first informed of it by Newton Owens.  He afterwards saw the body where it lay, about one hundred or one hundred and fifty yards distant from a neighborhood road, and about seven miles south from Crockett.  The throat was cut from ear to ear.  She had three cuts on the throat, and two stabs in the side.  The body lay slightly inclined to one side, the right arm a little under the head, and the legs drawn up a little towards the upper body.  Witness saw some blood about ten or fifteen steps from the body, and Mattie's hat lying near it.  Her sacque was pulled up, and entirely covered the wounds in the throat, as the body lay.  Witness could discover no signs of a scuffle or struggle near the body.  Witness and the parties with him noticed, on top of a small knoll in the road, the tracks of two persons which indicated that they had stopped there to converse.  This little knoll was about three feet wide, and was part of the dim, grass-covered neighborhood road.  It was too densely covered with grass and leaves to retain the impression of foot-prints passing over it.  The impres-

sions on the knoll disclosed the presence of but two persons, a man, wearing about a number eight boot, and a woman with a smaller foot. The print of one of the heels showed that one of the parties while there was in a squatting or stooping position. Witness could find no indication of blood near the knoll, but between the knoll and the point where the body lay he saw disturbed grass and misplaced leaves, indicating that some one had recently passed over the ground.

Witness and his party made further and diligent search for human tracks, but found none save those on the knoll. They did find, however, near the knoll, the tracks of a horse that must have been running when he made them. This track was followed four or five hundred yards to a branch, where the rider had dismounted. Across this branch the tracks were recovered and followed on until a second branch was reached. At this branch the rider had again dismounted. Here was found the counterpart of the boot track found at the knoll, going from where the rider dismounted to a pool of water, a few steps up the branch. At this pool, it was evident that the party bathed his hands at least. A handkerchief, with what the witness took to be blood stains, was found in the water at this point. The deceased was a young and stout negro woman, weighing perhaps one hundred and thirty-five pounds. The defendant would perhaps weigh one hundred and forty or fifty pounds, and was about thirty-five or forty years old. Newton Owens was about twenty years old.

Cross-examined by the defense, the witness stated that he was justice of the peace of the precinct in which the murder was committed, and as such officer he presided at the inquest over the body. From the point where it lay near the neighborhood road leading from Ike Porter's to Mrs. Leverton's, the body was taken to Ike Porter's house, and the inquest was held on the Sunday following the killing, which occurred on Friday. The point where the body was found was about a half mile distant from the house of old Uncle Billy Lewis, and about a quarter of a mile from the house of Martin Van Buren. Nothing was disclosed at the inquest which tended, in the opinion of the witness, to implicate the defendant in the commission of this offense. Newton Owens was then under arrest. When Newton Owens reported the death of Mattie Murchison to the witness in Crockett, he told witness that he was walking along the road with the deceased on the fatal Friday, going with her to Mrs. Leverton's house, and that they met two white men on the road who took the girl away from him, cursed him and made him leave, and that after he left her he heard her scream two or three times, and be-

lieved that she had been killed. The road described forked about two or three hundred yards from the house of old Uncle Billy Lew's, one fork leading to Mrs. Leverton's, and the other to Martin Van Buren's. Witness compared the tracks found at the knoll, and the tracks found at the branch and pool, with Newton Owens's foot, and they were evidently Owens's tracks. Witness was positive that those tracks — made by about a number eight boot — were not the tracks of the defendant, who wears at least a number ten, and possibly a number eleven boot or shoe. Some freshly washed men's wearing apparel was found at the house of George Owens, the father of Newton Owens.

Ellen Porter was the next witness for the State. She testified that she lived at Ike Porter's, where the deceased had been spending a few days prior to her death. She saw the defendant and Newton Owens at that house on the day of the killing. They came there rather early in the morning. The defendant arrived first, and asked at once if Newton Owens had arrived and where he could be found. Defendant presently went into the room where the deceased was, and was looking for a gun with which to shoot at a spot. He asked some one where it was, and deceased said: "There it is, standing in the corner." When the defendant left the room he manifested surprise that deceased should notice him, remarking, "Mattie spoke to me." The defendant and others then organized a shooting match, and fired several times at a spot. Defendant came to the house with Charley Porter from Mr. Thompson's, where they had gone to kill hogs, which, however, they did not do, as the weather was too warm. The defendant, while at Ike Porter's, made some change in his clothing, taking off his fine Sunday shirt, and putting on a common Lowell shirt, the neck and wristbands of which the witness fastened for him. He brought that shirt with him when he came to the house on that morning. He remarked that he was ruining his Sunday pants, and tried but failed to get another pair.

About a week prior to this time the deceased and the defendant had a violent dispute in which the deceased abused the defendant in unmeasured terms, and the two had not been on speaking terms since. During this morning the witness saw the defendant and Newton Owens retire together behind the chimney on the opposite side of the house from which the deceased was, and there they engaged for some ten or fifteen minutes in private conversation. Neither the witness nor any one else overheard what passed between them. Between 12 and 1 o'clock on the same day, Mattie left Ike

Porter's house, saying that she was going to Mrs. Leverton's, where she had hired to work. She went in that direction on foot. Newton Owens, on horseback, followed in the same direction within the next fifteen or twenty minutes. Charley Porter having in the mean time killed a hog, got the whetstone to sharpen his knife for the purpose of carving up the carcass. The defendant, seeing the whetstone, said: "That is just what I want; lend me that whetstone to sharpen my knife." He took from his pocket an ordinary pocket knife and sharpened it on the stone, and afterwards restored it to his pocket. The defendant remained at the house for some little time after Newton Owens left, taking dinner. All the parties at the table, including defendant, knew that Mattie had started to go to Mrs. Leverton's. He finished dinner before the others did, left the table first, and left the place before any one knew that he was gone. He took his shirt off with him. As near as the witness could locate the hour, it was about 2 o'clock in the afternoon when he left.

Cross-examined, the witness testified that the defendant remained at Ike Porter's house for some time — how long she could not say — after Mattie and Newton left. Mattie left on foot and Newton on horseback. Defendant followed, walking. The defendant brought both shirts with him when he came to the house in the morning. Witness's mother's name was Rose Hancock or Porter. Witness did not tell the justice of the peace what she knew at the time of the inquest.

Charlie Porter was the next witness for the State. He testified substantially to the same facts as they were detailed by Ellen Porter. He stated, in addition, that when he and defendant arrived at Ike Porter's house from Thompson's on the day of the killing, defendant asked if Newton Owens had been there that day. Witness saw the defendant when he left the house after dinner. He followed in the direction taken by Newton and Mattie. Witness heard the difficulty between the deceased and the defendant about one week before the murder. He heard the deceased curse the defendant, call him a "d—d whoremonger," and heard her tell him that she did not "monk" with his kind. She cursed and abused the defendant violently on that occasion. She and defendant had been to church, the deceased walking and the defendant riding horseback. This was about 9 o'clock at night. Defendant rode on and nothing more was said that night. The next morning they met in the road; the deceased at the time was walking with another woman. Defendant took his position on the side of the woman opposite from the de-

ceased, and winked and made faces at deceased. Deceased asked: "What are you winking at me for, you d—d son-of-a-b—h?" Defendant replied that he wanted to know what she meant the night before when she spoke of "monkeying," etc., and added: "You are only mad because I monkied with your mother, and not with you." Deceased cursed and abused the defendant violently, and said to him: "I don't 'monk' with your sort. I knew you when you monked with your own mother." A violent quarrel ensued between them, and defendant told the deceased that he would get even with her yet. The quarrel having ended, the defendant remarked that that was the second or third time that the deceased had treated him in that manner, and that it would be the last. This remark he made in a very emphatic manner.

Billy Lewis was the next witness for the State. He testified that he lived about a quarter of a mile west from Ike Porter's house. Mattie Murchison stopped at the witness's house between 12 and 1 o'clock on the Friday of her murder. She had been there but a few minutes when Newton Owens rode up, and got down. Newton went into the house and remained there talking to Mattie for something over an hour. He sat in Mattie's lap, and they hugged, kissed and caressed each other during the whole of the time they were at the witness's house. They left together about 2 o'clock, both walking, Newton leading his horse. They went towards Mrs. Leverton's, where Mattie said she had taken service. Soon after they started, and before they got out of sight, defendant came to witness's house from the direction of Ike Porter's. He inquired for Mattie and Newton. Witness told him that they had just gone, and, pointing up the road, said: "Yonder they go." Witness asked defendant to go into the house, but he declined on the plea that he was hurried, and followed rapidly in the direction taken by Mattie and Newton. Witness lived about a half mile east from the point where the deceased was killed. Martin Van Buren lived between a quarter and a half mile west from witness.

Cross-examined, the witness stated that, on leaving, the defendant went off in the direction of Van Buren's. Witness could not be positive, but thought it was about 2 o'clock when he left. He had heard Mary Van Buren say that it was 3 o'clock when he got to her house. The road forked at a distance of three or four hundred yards from the witness's house. Witness could not see the forks of the road from his house, and could not tell which of the forks was taken by either of the parties.

Mary Van Buren was the next witness for the State. She testified

that on Friday, the day of the murder, the defendant came to her house just at 3 o'clock from the direction of Billy Lewis's. He was apparently composed, and seemed in no hurry whatever. After he had been at the house a quarter or a half an hour, Laura Jones came and defendant asked her, if she had seen Newton Owens, and she answered that she had; that he had just passed her house, inquiring for the defendant. Defendant replied that Newton promised to leave some clothes at her (Laura Jones's) house for him. Laura replied that Newton had left a pair of saddle-bags at her house for him. Defendant remained at the house of the witness until after sundown, and went home with Laura Jones. The deceased was killed back of the witness's field, some four or five hundred yards distant from witness's house. When the defendant reached the witness's house he had on a soiled Lowell shirt which, apparently, he had worn all the week. He had no bundle of clothes that witness saw. Witness lived a half or perhaps three quarters of a mile from Ike Porter's house.

Thomas Hughes testified, for the State, that he spent the day on which the murder occurred at Mary Van Buren's house, and saw and heard all that transpired from the time the defendant arrived at that house until he left it. Dick Stanton's wife was at Mary Van Buren's at the same time. Witness corroborated Mary Van Buren circumstantially.

Laura Jones, who next testified for the State, detailed what had transpired between herself and the defendant at Mary Van Buren's house exactly as it was related by that witness. She was attended home from Van Buren's by defendant about dusk on that day. The witness first saw Newton Owens at her yard gate about 3 o'clock on that day. He came there on horseback, but witness could not say from which direction. He asked for the defendant, and left at once, going towards the house of George Owens, his father, who lived south about one and a half miles from the witness. Witness lived distant from Van Buren's about three or four hundred yards. Defendant, and others who were present, remained at the witness's house until about one hour after dark, when Newton Owens arrived. When Owens arrived, the defendant and some one were playing a game with grains of corn. After he had been in the house some ten or fifteen minutes, Newton Owens remarked that he had been awfully frightened that day. Defendant looked up and said: "I was too, old horse," and at the same time he sprang up from the floor where he had been playing with the corn, and seized Owens's hand. This he did in a laughing, free and easy manner. Relating

the incidents of his fright, Owens said that he and Mattie were walking along the road *en route* to Mrs. Leverton's, when they met two white men with shot-guns; that they cursed him and told him to get home, and to get quick; that they took Mattie from him, carried her into the woods, and, he thought, had killed her, as he heard her scream two or three times after he left her; that he supposed they had cut her throat. He stated further, that, when they ordered him to " get," he did not hesitate to obey them, but sprang on his horse and ran through the woods; that his horse ran under the limb of a tree which struck his nose, and caused it to bleed over the bosom of his shirt. The parties present listened to Owens's account of his adventure. Defendant did not say what frightened him, but advised Owens to go and tell old man Stanton and other white men about what had occurred. About an hour after this conversation Owens and defendant left, saying that they were going to apprise the white people of what had probably occurred to Mattie. Witness did not recollect whether or not they took off the saddle-bags which Newton Owens left there in the morning on his way, as he said, to Ike Porter's.

Cross-examined, the witness said that Newton Owens passed her house about thirty minutes before sunset on the evening of the murder, but left nothing at her house at that time. Witness went to Martin Van Buren's immediately after he passed by. Witness lived between three and four hundred yards from Van Buren's, and about a half mile from where the body was found.

Albert Jones, the husband of the witness Laura, was the next witness for the State. Witness returned to his home after night on the day of the murder of Mattie Murchison, and found the defendant and Owens at his house. The witness then detailed what transpired, and what was said by Owens and defendant in that house, substantially as it was related by his wife Laura. Newton Owens at that time lived one and a half miles south of witness, at the house of his father, George Owens. On the day following, search was made for the body of Mattie Murchison. Newton Owens and defendant, as well as the witness, were members of the searching party. The body was found in the evening about a hundred and fifty or two hundred yards from the road. Newton Owens piloted the party to the place where he said he and Mattie were intercepted by the white men, and it was near this point that the body was found.

Cross-examined, the witness testified that he saw blood on the deceased's hat and on her bosom. It had also run down on her

dress. She was lying in the position stated by the witness Frank Hill. There were no evidences of a scuffle or struggle near the body, but it lay composed as if carefully placed there. Witness was one of the first of the party to reach the body. Witness, at his house on Friday night, saw blood on Newton's shirt, which he said came from his nose. He saw no blood on the defendant, nor did he look for any. In explanation of the blood on his shirt, Newton said that he was struck on the nose by a limb in his flight from the two white men who took Mattie from him. Newton Owens was about twenty years old, and was now in the penitentiary, to which he was sent for the commission of this murder. Defendant was about thirty-five years old, would weigh from one hundred and sixty-five to one hundred and seventy-five pounds, and was a very stout man.

George Owens was the next witness for the State. He testified that he was the father of Newton Owens, now serving a term in the penitentiary for the commission of this offense. About 9 or 10 o'clock on the night of the day that Mattie Murchison was killed, the defendant and Newton Owens came to the witness's house. Newton told witness about the same story that he told others about the white men taking Mattie from him. He told witness also that he and defendant had that night been to the houses of several white men, reporting the occurrence. Witness told him in reply that he ought to have reported the facts at once, and not waited until night. Newton replied, in the presence and the hearing of the defendant, that, in doing as he did, he acted upon the advice of the defendant. Defendant heard this statement made by Newton Owens, but said nothing. Defendant stayed at witness's house that night, sleeping with Newton, and left next morning, going, he said, to Mr. Thompson's. One or two months after Newton Owens was arrested for this murder, it occurred to witness that defendant knew something about the facts of the case, and would make a good witness in Newton's defense, and accordingly witness appealed to him to tell what he did know. Defendant replied that what he did know about it would never be known except by his God. Witness went to defendant again, some time later, and asked him what he knew about the killing. In reply he asked why witness kept asking him about the case. Witness told him that people generally so persistently coupled his, the defendant's, name with that of Newton in the murder, that he, witness, had concluded that possibly defendant knew something about it. Defendant replied that he had lived a miserable life, and found no satisfaction in it since the death of

Mattie; that when alone in the woods something seemed to be perpetually talking to him, and that as soon as he had completed the two "cuts" of rails he was then engaged on, he was going to leave the country; that he was tired of people talking about him in connection with the murder of Mattie Murchison; that he would die before he would submit to arrest on this charge, and that he knew all of the officers of the county, and would kill any one of them who came into the woods to arrest him. Defendant shortly left that neighborhood and went to work at the White Rock settlement, twelve miles distant. Newton attended a show in town a few days before the death of Mattie, and loaned his knife to some one and did not get it back. Witness was pretty certain, but not positive, that Newton had no knife on the day that Mattie was killed.

Crossed by the defense, the witness stated that he was cognizant of these facts when his son Newton was on trial for this offense. He told no one, not even the grand jury, about them. Defendant did not seem particularly sorry about the death of Mattie when witness talked with him in the woods. That conversation transpired before there was a case against the defendant.

T. W. Thompson was the next witness for the State. He testified that defendant came to his house about the breakfast hour on the morning after the murder, and asked if witness had heard of what had occurred to Mattie and Newton, and repeated the abduction story. He went on to say that he feared Mattie had been killed, and that suspicion would rest on him. He talked carelessly about the matter. He returned to witness's house and asked to be released from his engagement to commence work for witness on the following Monday, assigning in excuse the "occurrence of recent circumstances." He did not explain the "circumstances."

Cross-examined, the witness testified that, at the time of the murder, defendant had no fixed residence, but worked around and lived where he worked. When he last left the witness's house, having declined to fulfill his engagement, he went to work for Mr. Hale, who lived about two miles distant from witness. Throughout the first part of the year (1884) he worked first at one place and then at another.

Jake Stanton testified, for the State, that he had known the defendant for twenty years. Witness had a conversation with the defendant about this case in front of Esquire Hill's office. He told defendant that he was satisfied that he, defendant, was the instigator of this crime — that he was at the bottom of it all. Defendant hung his head and walked off, without making any reply whatever.

Branch Richards was the next witness for the State. He testified that, in February or March following the murder, he overheard the defendant talking about the case to his, witness's, wife. He told witness's wife that all he feared in connection with the matter was that Newton Owens would turn State's evidence against him, and that if Newton did so, he, defendant, was "gone up, world without end." This conversation between defendant and witness's wife lasted some time, and the witness heard that part of it related as he passed in and out of the room, making a fire.

Cross-examined, the witness said that defendant married his sister, but was then and is now separated from her. Witness was as friendly as ever with the defendant, and had never thought hard of him. Witness could not remember when he first told these facts. He told several colored people, and one white man, Mr. Dick English.

Hannah Richards testified, for the State, that in the February or March following the murder of Mattie Murchison, the defendant came to her house and applied for board. Witness told him that she did not want him about her; that people had so much to say about his having participated in the murder that she was afraid of him. Defendant protested that he would not hurt witness, but witness declined to receive him, and he left. He returned a few days later, and said that he had understood that witness had expressed the opinion that he was one of Mattie's murderers. Witness acknowledged that she had expressed that opinion, and that she was afraid of him. She told him, further, that, as he was universally suspected, it looked to her very much like he was guilty; and asked him why, if he was innocent, he manifested so much interest in Newton Owens's case; why, on the Sunday of the inquest, he tried so hard, by slipping and sliding around, to get to speak to Newton, who was then under arrest, charged with the murder. Witness then asked him if he succeeded in speaking to Newton on that occasion. He replied that he did, and that he directed Newton what to say and what to do. He then told witness that his life since the murder of Mattie had been one of unmitigated misery. Witness then asked him why, if innocent, he was so unhappy and uneasy — that unless guilty he had nothing to fear. He then said that he had but the one fear, that Newton Owens would turn State's evidence against him, in which event he was "gone up, world without end." Witness's husband, Branch, was present and heard this conversation. Witness had detailed these facts to several black people, and to Mr. Dick English, a white man. She had never told the officers until testifying on this trial. She and defendant were on friendly terms.

Constable Reuben Smith testified that he arrested Newton Owens for the murder of Mattie Murchison, and had him present at the inquest. Defendant was present when the inquest occurred, and seemed restless and uneasy. He asked of witness the privilege of a private talk with Newton Owens, which witness granted. He and Newton retired from the crowd some little distance and had a private conversation, lasting some fifteen or twenty minutes. Witness heard nothing said by either Owens or defendant.

General Owens, a brother to Newton Owens, was the next witness for the State. He testified that he was present and heard the quarrel between the defendant and Mattie about a week before the killing. Mattie abused the defendant savagely, called him a "d—d son-of-a-b—h," a "d—d liar," and accused him of "monkeying" with his own mother. After the quarrel was over, and the parties had separated, the defendant, who appeared very much exasperated, said, in a determined and emphatic manner, that Mattie had treated him in that way two or three times before, but would not do it again. Again, soon after the murder, between 8 and 9 o'clock, while witness and defendant were *en route* to church, defendant told witness that he wanted a private talk with witness, and took witness into the recesses of the woods. He then asked if witness thought that Newton killed Mattie, and if he thought that any one was with Newton and aided him, if he did? Witness replied that he did think some one was with Newton. Defendant asked why witness thought so. Witness replied that it was evident Mattie had been killed elsewhere, and the body carried to the place where it was found, and the manner in which this was done indicated plainly that more than one man had a hand in it. Defendant then asked who witness suspected, and witness replied that it was unnecessary to answer that question, as he did not know. Defendant then said that he merely wanted to know what the witness thought about it. Witness related these facts to Judge Thompson and Dan Adair.

Frank Hill, recalled by the State, testified that he saw the defendant on the Sunday after the killing, and asked him if he had changed clothes during the week. He replied that he had not. He then had on a fine white linen bosom shirt. Witness suspected the complicity of defendant then, as he had learned that he left Ike Porter's on the fatal Friday, soon after Owens and Mattie left. Deputy Sheriff Bayne on that day suggested to witness the propriety of arresting defendant on a charge of murdering Mattie Murchison. George Owens told witness on the day of the inquest that he knew nothing about the case.

Deputy Sheriff D. H. Bayne testified, for the State, that he was present at the inquest over the body of Mattie Murchison, and, during part of the day, had Newton Owens in charge. When not in his charge, Owens was in charge of Constable Smith. The defendant was at that inquest. He appeared very restless and uneasy, passing first from one party to another, in conversation, and taking first one person and then another off from the crowd to talk to privately.

The charge upon circumstantial evidence, referred to in the opinion, and which is the subject-matter of the second head-note of this report, reads as follows:

"All facts in the case may be proved by either circumstantial or direct evidence, and, in order to show the defendant guilty of the murder of Mattie Murchison, the State relies alone upon circumstantial evidence. The rule applicable, and by which you are to be guided and governed in weighing and determining upon its sufficiency, is that each fact, in any chain of facts from which the defendant's guilt is to be inferred, must be proved by the same weight, degree and force of evidence as if it were the main fact of the defendant's guilt itself; all of such facts must be consistent each with all of the others and with the defendant's guilt, and all, taken together, must be so strong as to exclude, to a moral certainty, every reasonable hypothesis but that of the defendant's guilt."

The motion for new trial raised the questions discussed in the opinion.

*Denny & Aldrich* and *J. D. Borden*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE. But two objections are urged to the charge of the court. It is insisted that the court should have instructed the jury upon the law of murder in the second degree. There was no exception taken to the charge at the time of the trial because of this omission, nor was any additional charge requested upon this point. In our opinion the evidence did not demand a charge in relation to the law of murder in the second degree, and it was not error to withhold such a charge from the jury. It is further insisted that the charge upon circumstantial evidence is insufficient, and that the special charge upon this subject which was requested by defendant should have been given. We think the charge as given fully and correctly informed the jury in regard to the rules governing this character of evidence, and would not have been made

any clearer or more correct by the additional instruction asked by the defendant. In all respects, we think the charge of the court is sufficient and adapted to the facts in proof.

Whilst the evidence is wholly circumstantial, it satisfied the jury of the defendant's guilt, and, in our opinion, it warrants their verdict. The facts in proof are inconsistent with defendant's innocence, and cannot be accounted for upon any reasonable hypothesis save that of his guilt of the murder. They exclude absolutely and to a moral certainty the hypothesis that any other person or persons except himself and Newton Owens, acting together, committed the deed. It is unnecessary that we should recite or discuss the facts. They will be given by the Reporter, and will speak for themselves.

Finding no error in the record before us for which the judgment should be set aside, it is in all things affirmed.

*Affirmed.*